UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-60186-CR-MOORE/SNOW

UNITED STATES OF AMERICA

vs.

AARON ROMAN BUTLER,

        Defendant.
_____/

## STIPULATED FACTUAL BASIS FOR PLEA

Had this case proceeded to trial, the United States of America would have proven beyond a reasonable doubt the following facts pertaining to violations of Title 21, United States Code, Sections 963 and 960(b)(1)(A) and illegal reentry after removal in violation of Title 8, United States Code, Section 1326(a) and (b)(1).

On March 10, 2017, a confidential source ("CS") approached law enforcement with information that SMITH had asked the CS to use the CS's 48-foot pleasure cruiser to transport drugs from Freeport, Bahamas, to Fort Lauderdale, Florida. The CS's boat was parked at a slip at Isle of Venice Drive, Fort Lauderdale, Florida. The CS met with SMITH and BUTLER on May 16, 2017. The recorded meeting took place aboard the CS's boat as it was docked in Fort Lauderdale, Florida.

SMITH and BUTLER engaged in discussions regarding the payment and details of transportation at the May 16th 2017 meeting. On the May 16, 2017 recording, SMITH and BUTLER are talking about this job being a test load that will lead to larger amounts of drugs and

1

larger payments for the CS later. They discuss that the CS will be paid $5,000 in USC for the expenses of the trip. They also discuss that his boat could hold "2000," while the CS insists that the boat can only hold "1000." The CS would testify that this conversation referred to 1000 or 2000 pounds of marijuana. SMITH and BUTLER explain on the recording that this load may be less drugs and be "green" (marijuana) and will involve less profit for the CS but that later loads will be "white" (cocaine) and involve more profit.

On July 21, 2017, SMITH and PINDER met with the CS and SMITH provided him with only $3,900 in USC (not $5,000) as an initial payment for the CS to travel to Freeport, Bahamas, on the CS's vessel, and pick up multiple kilograms of cocaine from a source. SMITH advised the CS that PINDER would travel on the vessel with the CS from Fort Lauderdale, Florida, to Freeport, Bahamas, to pick up the kilograms and return to Fort Lauderdale on the vessel with the CS. The agreement between the parties was that the CS would maintain possession of the cocaine until his fee was paid. A fee was discussed of $3,000 per kilogram of cocaine that the CS imported. This meeting could not be recorded.

On July 22, 2017, a recorded meeting takes place on the boat. SMITH, in coded language, discusses generally that the CS will be paid a certain fee in addition to his expenses based on the amount of drugs imported. SMITH says "18" on the recording which the CS would testify refers to 18 kilograms of cocaine. SMITH and PINDER are recorded talking about how this load will lead to larger loads involving "500 pieces" (500 kilograms of cocaine) and that much more money will be made on those later loads.

On July 28, 2017, the CS, PINDER, and another individual traveling with the CS, departed on the CS's boat from Fort Lauderdale, Florida, destined for Freeport, Bahamas. While it was

2

still daytime, they arrived in the water near Freeport and were met by another smaller vessel whose three occupants transferred 15 kilograms of cocaine on to the CS's vessel. The audio and video of this clearly shows the three individuals and the transfer of a black plastic trash bag. The recording later shows PINDER stacking the kilogram bricks of cocaine inside the cabin of the CS's vessel. The CS, PINDER, and the third individual then returned to Ft. Lauderdale.

During the return trip, PINDER and the CS had several conversations regarding what would happen with the cocaine once they arrived in Ft. Lauderdale. PINDER told the CS that PINDER would have to stay with the cocaine and at one point, PINDER began moving a large cooler that the CS believed PINDER was going to try and use to the take the cocaine off the vessel.

Prior to the vessel's arrival in Fort Lauderdale, law enforcement established surveillance in the area of Isle of Venice Drive, the location where the vessel was expected to dock. Soon, surveillance observed a dark gray Nissan Altima conduct counter-surveillance by driving up and down the street in the area several times. This vehicle, rented in BUTLER's name, matched the description given by the CS of the vehicle driven by BUTLER, when the CS, SMITH and BUTLER met earlier at that same location.

After the CS's vessel arrived, SMITH and BUTLER exited the dark gray Nissan Altima and walked toward the vessel. SMITH told the CS that (contrary to their prior agreement) he was taking the cocaine off the boat and that he would leave only one kilogram of cocaine for the CS.

SMITH then boarded the boat in order to remove the cocaine. When the CS tried to stop him, SMITH grabbed the CS by the neck and pushed the CS to the floor of the vessel. SMITH pointed at BUTLER, who was not on the boat, SMITH then told the CS that BUTLER would shoot the CS if the CS tried to stop him from removing the cocaine. The third individual would testify

3

that during the time SMITH was fighting with the CS, BUTLER stated to this individual "Don't worry, you guys will get your money" and that BUTLER told him not to get involved when SMITH was fighting with the CS.

Law enforcement then initiated a takedown at which point BUTLER fled on foot and was apprehended near the Altima. No firearm was recovered. After the takedown, SMITH, while handcuffed, took his phone from his pocket and threw it into the water. Law enforcement seized one phone from BUTLER and two phones from PINDER.

During a recording in the squad car, SMITH is telling BUTLER to tell law enforcement that he ran because he always runs.

A subsequent search of the vessel revealed 15 kilograms of cocaine in 15 separate "bricks" inside of a black plastic trash bag in a cabinet inside the CS's vessel. Post-Miranda, BUTLER claimed that he never exited the Nissan Altima.

BUTLER is a native and citizen of the Bahamas, who attempted to enter the United States on February 24, 2012 without proper authority aboard a boat from the Bahamas. After he was apprehended by immigration authorities, he was removed to the Bahamas on June 14, 2012 and denied permission to seek re-entry for at least five years. The removal was contemporaneously documented on a Form I-213, reflecting the defendant's fingerprint and photograph, as well as the signature of an immigration official who witnessed the removal.

On May 16, 2017, BUTLER was found to have voluntarily returned to the United States, when he attended a recorded meeting with the CS and SMITH in Fort Lauderdale, Florida. On July 28, 2017, BUTLER was arrested in Fort Lauderdale, Florida. His prior removal was confirmed at that time and computer checks of all Department of Homeland Security databases

4

revealed that BUTLER did not have the express consent of the Attorney General or his successor, the Secretary of Homeland Security, to apply for readmission to the United States.

BUTLER is therefore illegally present in the United States without permission after he was previously removed from the United States.

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

Date: 8/30/17       By: _____
TIMOTHY J. ABRAHAM
ASSISTANT UNITED STATES ATTORNEY

Date: 8/30/17       By: _____
MAURICIO LOPEZ ALDAZABAL
ATTORNEY FOR DEFENDANT

Date: 8/30/17       By: _____
AARON ROMAN BUTLER
DEFENDANT

5